UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ROBERT PEREZ, | ) No. CV 16-9342-PLA |
| Plaintiff, | ) **MEMORANDUM OPINION AND ORDER** |
| v. | ) |
| NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) |
| Defendant. | ) |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on December 19, 2016, seeking review of the Commissioner's[1] denial of his application for Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on January 10, 2017, and January 16, 2017. Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on August 2, 2017, that addresses their positions concerning the disputed issue in the case. The

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy Berryhill, the current Acting Commissioner of Social Security, is hereby substituted as the defendant herein.

Court has taken the Joint Stipulation under submission without oral argument.

## II.

## **BACKGROUND**

Plaintiff was born on October 20, 1969. [Administrative Record ("AR") at 167.] He has past relevant work experience as an operations supervisor, a security guard, and a prisoner transporter. [AR at 18, 34-35.]

On August 23, 2013, plaintiff filed an application for SSI payments, alleging that he has been unable to work since March 29, 2013.[2] [AR at 9, 167-72.] After his application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 9, 93-95.] A hearing was held on April 14, 2015, and on October 5, 2015; plaintiff appeared at both hearings represented by an attorney, and testified on his own behalf. [AR at 24-36, 37-53.] The same vocational expert ("VE") also testified at both hearings [AR at 31-35, 48-52], and a medical expert ("ME") testified at the second hearing. [AR at 40-43.] On November 12, 2015, the ALJ issued a decision concluding that plaintiff was not under a disability since August 23, 2013, the date the application was filed. [AR at 9-19.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 5.] When the Appeals Council denied plaintiff's request for review on November 7, 2016 [AR at 1-3], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

/

/

/

## III.

---

[2] The Court notes that plaintiff's application for SSI payments reflects that he was alleging disability since February 1, 2013. [AR at 167.] Other records, however, reflect March 29, 2013, as the alleged onset date. [See, e.g., AR at 9, 54, 190, 194 (also reflecting that plaintiff made changes to his work activities on February 1, 2013, due to his conditions).] Whether the alleged onset date was February 1, 2013, or March 29, 2013, does not impact on the Court's decision.

2

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

**IV.**

**THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

## A. THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996. In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. Id. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

## B. THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 23, 2013, the application date. [AR at 11.] At step two, the ALJ concluded that plaintiff has the severe impairments of rheumatoid arthritis and morbid obesity. [Id.] He found plaintiff's

medically determinable impairment of hypertension to be nonsevere. [Id.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing. [Id.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. § 416.967(b),[4] as follows:

> [He] can lift no more than twenty pounds occasionally, and he can lift ten pounds frequently. He can stand and walk no more than four hours, and he can sit for six hours with normal breaks. [Plaintiff] can push and pull with his right lower extremity occasionally. He can occasionally negotiate ramps, stairs, ladders, ropes, and scaffolding. [Plaintiff] can frequently balance, stoop, kneel, crouch, and crawl. [He] can perform fine and gross manipulation frequently.

[AR at 12.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is able to perform his past relevant work as an operations supervisor and a security guard. [AR at 18, 35, 51.] Accordingly, the ALJ determined that plaintiff was not disabled at any time since August 23, 2013, the date the application was filed. [AR at 19.]

**V.**

**THE ALJ'S DECISION**

Plaintiff contends that the ALJ erred when he rejected the opinions of plaintiff's treating rheumatologist, Jaffar A. Tremazi, M.D. [JS at 2.] As set forth below, the Court agrees with plaintiff and remands for further proceedings.

---

[3] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b).

## A. MEDICAL OPINIONS

### 1. Legal Standard

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012. The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725. The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." Id.

Although the opinion of a non-examining physician "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray v. Astrue, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the

DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations). Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

### 2. The Medial Opinions

On August 14, 2015, Dr. Tremazi, plaintiff's treating rheumatologist between June 2014 and August 2015, completed a "Medical Opinion Re: Ability to do Work-Related Activities (Physical)" form. [AR at 446-48.] Dr. Tremazi found that plaintiff had the following limitations: can lift and carry ten pounds occasionally, and less than ten pounds frequently; stand and walk about two hours in an eight-hour day; sit about three hours in an eight-hour day; needs to alternate between sitting and standing or walking every twenty to thirty minutes; needs to be able to shift at will from sitting or standing/walking; will need to lie down approximately three times during a work shift; can occasionally twist, stoop (bend), crouch, and climb stairs and ladders; would have trouble with fine manipulation as a result of his impairments; and should avoid concentrated exposure to cold, heat, wetness, humidity, noise, fumes, and hazards (machinery, heights, etc.). [Id.] He also opined that plaintiff would be absent from work more than three times per month as a result of his impairments or treatment. [AR at 448.] He noted that plaintiff's lifting/carrying, and standing/walking/sitting limitations were supported by the swelling in plaintiff's hands, elbows, and knees. [AR at 447.]

The ALJ gave "little weight" to Dr. Tremazi's opinion:

> Dr. Tremazi's opinion is inconsistent with the findings from his own examinations. For example, in 2015, Dr. Tremazi consistently found [plaintiff's] skin did not have any abnormalities, his extremities did not have any abnormalities, there was not any atrophy noted in any muscle groups, and [plaintiff's] muscle strength was 5/5 in both his upper and lower extremities. [AR at 338, 339, 342, 343, 450, 451, 454, 455, 458, 459.] Additionally, Dr. Tremazi's opinion is inconsistent with the diagnostic imaging contained in the record. [AR at 310 (stating only a "plan" to obtain a lumbar MRI), 399.] Further, Dr. Tremazi's opinion is inconsistent with laboratory findings which showed [plaintiff's] inflammation was controlled with the use of medications. [AR at 457.]

[AR at 17.]

The ALJ gave only "some weight" to the impartial medical expert, Dr. Morse, who testified

at the hearing that plaintiff can lift ten pounds occasionally and frequently; is limited to standing/walking for two hours out of an eight-hour day; can sit for six hours out of an eight-hour day; is limited with the use of his right lower extremity for pushing and pulling foot pedals; can occasionally climb ramps and stairs, balance, and stoop; can never climb ladders, ropes, or scaffolds; is limited bilaterally to frequent gross and fine handling; and should avoid concentrated exposure to hazardous machinery and unprotected heights. [AR at 16, 40-41.] Dr. Morse also noted that plaintiff was taking some "major league medicines," which had brought his "sed rate and his other inflammatory markers . . . down," but that plaintiff does have "active synovitis, and he does have limitations of multiple joints." [AR at 42.] He opined that plaintiff "could perform sedentary activities, with the restrictions" he had offered. [AR at 43.]

The ALJ gave great weight to the November 10, 2013, report of the consultative examiner, Azizollah Karamlou, M.D. [AR at 253-57.] Dr. Karamlou found that plaintiff can lift twenty pounds occasionally and ten pounds frequently; stand/walk and sit for six hours; push or pull with his lower extremities; cannot climb ladders or be exposed to heights, possibly on a temporary basis; cannot walk on uneven terrain; has no restrictions for fine and gross manipulative movements of both hands; and has no environmental restrictions. He also gave great weight to the February 6, 2014, opinion of state agency reviewing medical consultants: Dr. Keairnes, who reviewed plaintiff's medical records through November 2013, and Dr. Cooper, who affirmed Dr. Keairnes' opinion on June 10, 2014. [AR at 54-64, 66-75.]

**B.    ANALYSIS**

    **1.    Dr. Tremazi**

The ALJ first discounted Dr. Tremazi's August 14, 2015, opinion regarding plaintiff's limitations on the ground that his opinion is inconsistent with his own examinations. [AR at 17.] In support, the ALJ noted that, based on Dr. Tremazi's treatment notes, Dr. Tremazi "consistently found [plaintiff's] skin did not have any abnormalities, his extremities did not have any abnormalities, there was not any atrophy noted in any muscle groups, and [plaintiff's] muscle strength was 5/5 in both his upper and lower extremities." [AR at 17 (citations omitted).] The ALJ

failed to explain, however, *how* a lack of skin and extremity "abnormalities" is necessarily inconsistent (if they are) with Dr. Tremazi's opinions about plaintiff's limitations from his rheumatoid arthritis; neither did the ALJ explain why a lack of atrophy and/or full muscle strength in the upper and lower extremities are necessarily unexpected findings (if they are) in light of plaintiff's diagnosis. Additionally, Dr. Tremazi also reported on February 5, 2015, that plaintiff's rheumatoid arthritis had been "very poorly managed by [the] previous physician," and he adjusted plaintiff's medications; on February 27, 2015, he again adjusted plaintiff's medications; and on April 24, 2015, he noted "elevated crp [C-reactive protein]," "still with severe synovitis," and indicated an intent to obtain authorization for the rheumatoid arthritis medication, Enbrel [AR at 449-52]; on June 19, 2015, he noted an ESR (erythrocyte sedimentation rate) test result of 16 and "seropositive RA [rheumatoid arthritis]," "still with severe synovitis," pain level at 8/10 of the shoulders, hands, elbows, and knees bilaterally; swelling in the knees; and that he was still waiting for authorization for Enbrel [AR at 453-56]; and, on August 14, 2015, Dr. Tremazi noted plaintiff's pain level at 8/10 bilaterally in the shoulders, hands, elbows, and knees; seropositive RA; "still with severe synovitis'"; and "continue Enbrel" (which apparently had been authorized sometime after June 19, 2015). [AR at 457-60.]

The ALJ also stated that Dr. Tremazi's opinions were "inconsistent with the diagnostic imaging contained in the record . . . [and] with laboratory findings which showed [plaintiff's] inflammation was controlled with the use of medications." [AR at 17 (citing AR at 310, 399, 457).] One of the cited records, however, is a November 23, 2014, treatment note that reflects only that plaintiff should "continue prednisone/folate and mtx [methotrexate] per his rheumatologist," and does not indicate that plaintiff's inflammation was controlled. [AR at 310.] Another record cited consists of x-rays taken on June 7, 2012 (two years before Dr. Tremazi started treating plaintiff for rheumatoid arthritis) of plaintiff's hands, feet, and knees, that generally reflected "no evidence of acute fracture, subluxation, or dislocation," mild degenerative changes of the left third distal interphalangeal (finger) joint; minimal degenerative changes of the bilateral medial compartments

of the knees; and mild enthesopathy[5] of the calcaneus of the right foot, and of the knees bilaterally. [AR at 399-402.] The ALJ did not explain *how* these x-rays were inconsistent (if they are) with Dr. Tremazi's opinions regarding plaintiff's limitations. Moreover, although there is a treatment record that seems to reflect that plaintiff's recent *laboratory results* may have been "nl [normal]" [see AR at 457 ("labs nl esr crp cmp cbc")], Dr. Tremazi also noted at that visit that plaintiff's pain was 8/10 bilaterally, he had "seropositive RA," and he was "still with *severe* synovitis," i.e., *inflammation* of the synovial membrane lining the joints. [AR at 457-60 (emphasis added).] There simply is no mention in that treatment record (or in any other of Dr. Tremazi's treatment records), that plaintiff's *inflammation* was "controlled[6] with the use of medications." In fact, the ME, who reviewed all of the medical records, including Dr. Tremazi's, testified that the "major league medications" plaintiff was taking led to his "sed rate and . . . other inflammatory markers" being "brought down," but that plaintiff still has seropositive rheumatoid arthritis, active synovitis, and "limitations of multiple joints." [AR at 42.]

Dr. Tremazi never mentioned any incongruence between his assessments that reflected "No Abnormality Detected" with respect to plaintiff's skin, neurovascular, and other system examinations, and plaintiff's diagnosis and other laboratory findings, nor did the independent ME express such concerns. Similarly, the ALJ's finding that plaintiff's range of motion, which was deemed by the examining physician to be "grossly within normal limits," was equivalent to being a "full range of motion" [see Discussion infra, part V. B.2.b], is also unsupported. It is improper for an ALJ to substitute his own opinion for that of a treating medical professional who examined plaintiff regularly for months. See Banks v. Barnhart, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, and he

---

[5]  If the areas where tendons and ligaments attach to bones become inflamed, enthesopathy, or pain in the area around the joint, may result. See http://www.healthline.com/health/enthesopathy.

[6]  The Court acknowledges that the ALJ may be using the term "controlled" to mean only that plaintiff's inflammation is *treated* with the use of medication; however, to the extent the ALJ uses "controlled" to indicate that the inflammation was alleviated or "under control" -- which is the more likely intent -- the evidence in Dr. Tremazi's records does not support that finding.

must not succumb to the temptation to play doctor and make his own independent medical findings.") (internal quotation marks, alterations, and citations omitted). In reviewing the medical opinions, that appears to be what the ALJ has done here.

Based on the foregoing, substantial evidence does not support the ALJ's findings that Dr. Tremazi's treatment records are not consistent with his opinions, not consistent with the diagnostic imaging in the record, or not consistent with laboratory records showing plaintiff's inflammation was "controlled." Thus, the ALJ did not provide specific and legitimate reasons for discounting Dr. Tremazi's opinions.

## 2. Harmless Error

In order to determine whether the ALJ's failure to provide specific and legitimate reasons for discounting Dr. Tremazi's opinion was harmless error, the Court will consider the weight given by the ALJ to the other medical opinions of record. See Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991) (harmless error rule applies to review of administrative decisions regarding disability).

### a. Dr. Morse

The ALJ gave the hearing testimony of the independent ME, Dr. Morse, only "some weight" because Dr. Morse "did not have the opportunity to examine" plaintiff.[7] [AR at 16.] Notwithstanding this observation, the ALJ nevertheless gave "great weight" to Drs. Keairnes and Cooper, the state agency consultants who reviewed plaintiff's medical records in early 2014, not only *without examining plaintiff*, but without the benefit of the records and opinions of Dr. Tremazi. The ALJ also gave the ME's opinions only "some weight" for the same reasons that he discounted Dr. Tremazi's opinions, i.e., Dr. Morse's opinion was "more limiting than treatment notes from Dr. Tremazi," and inconsistent with the June 7, 2012, diagnostic testing, which consisted of x-rays of

---

[7] Dr. Karamlou, the consulting examiner to whom the ALJ gave "great weight" [AR at 16], only examined plaintiff on one occasion, on November 10, 2013, several months before plaintiff was first seen by Dr. Tremazi, his rheumatologist. [AR at 253-57.]

11

plaintiff's hands, feet, and knees to "rule out osteoarthritis." [AR at 15-16 (citing AR at 399-402).] Those reasons, which were discussed -- and rejected -- above, fare no better in the context of discounting Dr. Morse's opinions. The ALJ's further finding that Dr. Morse's opinion was inconsistent with the consultative examination results, is rejected based on the Court's findings regarding the consultative examination results discussed below.

### b. Drs. Karamlou, Keairnes, and Cooper

The ALJ found that Dr. Karamlou's opinion that plaintiff was capable of a range of light work was consistent with his consultative examination of plaintiff, which the ALJ stated reflected a "full range of motion in [plaintiff's] cervical spine, lumbar spine, shoulders, elbows, wrists, hands, and hips." However, with the exception of plaintiff's right knee, which Dr. Karamlou stated showed decreased range of motion, Dr. Karamlou actually reported that plaintiff's range of motion in each of these areas was "*grossly within normal limits.*" [AR at 255-56 (emphasis added).] As he did not include any of plaintiff's actual clinical test results, it is ambiguous at best whether plaintiff actually had a *full* range of motion in any of these areas.

The ALJ also found Dr. Karamlou's opinion to be consistent with "the diagnostic imaging in the record and the normal exam findings [in 2015] by [plaintiff's] rheumatologist." [AR at 16 (citations omitted).] He also relied on the same diagnostic imaging results and Dr. Tremazi's purportedly "normal" examination findings for giving the opinions of the reviewing examiners, Drs. Keairnes [AR at 54-62] and Cooper [AR at 66-73], "great weight." As discussed above, however, because the ALJ did *not* properly consider the diagnostic imaging results and/or Dr. Tremazi's examination findings, those findings also do not constitute substantial evidence for giving "great weight" to the consulting and reviewing examiners' opinions.

Moreover, of note -- and not mentioned by the ALJ -- both Dr. Keairnes and Dr. Cooper acknowledged that Dr. Karamlou's opinion "[did] not fully consider the pain, effusion and limited motion of right knee nor the extensive tenderness of hands, wrists and other joints that he described." [AR at 59; see also AR at 73 (stating that Dr. Karamlou's opinion "does not seem to reflect the extensive pattern of joint and back tenderness that he found").] In light of their concern,

the reviewing examiners generally found plaintiff somewhat more limited than did Dr. Karamlou. For instance, they found plaintiff able to stand and walk no more than 4 hours (as opposed to Dr. Karamlou's 6 hours *and the RFC* for 6 hours); occasionally able to climb ramps, stairs, ladders, ropes, and scaffolds (an opinion adopted by the ALJ and in contrast with Dr. Karamlou's finding that plaintiff could not climb ladders or work at heights at least on a temporary basis); frequently able to balance and stoop (an opinion adopted by the ALJ and in contrast with Dr. Karamlou's finding of no limitation); occasionally able to kneel, crouch and crawl (as opposed to Dr. Karamlou's finding of no limitation and the RFC finding that plaintiff could kneel, crouch, and crawl frequently[8]); and able to perform fine and gross manipulations frequently (an opinion adopted by the ALJ in the RFC as opposed to Dr. Karamlou's finding of no limitation).

To determine plaintiff's RFC, the ALJ appears to have selectively picked from the findings of Dr. Karamlou and Dr. Keairnes when those opinions were not even consistent with each other. See Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001) (concluding that the ALJ's basis for rejecting the treating physician's medical opinion was not supported by substantial evidence because the ALJ "selectively relied on some entries . . . and ignored the many others that indicated continued, severe impairment"). Additionally, the reasons he gave for giving "great weight" to the opinions of Drs. Karamlou, Keairnes, and Cooper -- that those opinions were *consistent* with Dr. Tremazi's treatment notes, diagnostic imaging, and laboratory findings -- were the same reasons he improperly relied on (albeit finding them *inconsistent* with Dr. Tremazi's and Dr. Morse's opinions) for discounting the opinions of Dr. Tremazi and Dr. Morse.

Based on the foregoing, the ALJ's failure to provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Tremazi's or Dr. Morse's opinions in favor of Drs. Karmlou, Keairnes, and Cooper, was not harmless error.

---

[8] The Commissioner defines "frequently" as an "activity or condition [that] exists from 1/3 to 2/3 of the time." See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, app. C. Thus, the hypothetical individual with the same RFC as plaintiff (and with the severe impairments of rheumatoid arthritis (including in his knees) and morbid obesity -- which the ALJ stated he had accounted for in the RFC's functional limitations [AR at 13]), would be expected to be able to kneel, crouch, or crawl for up to 2/3 of a work day.

Remand is warranted on this issue.

## VI.

## **REMAND FOR FURTHER PROCEEDINGS**

The Court has discretion to remand or reverse and award benefits. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, because the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Tremazi and Dr. Morse, the ALJ on remand shall reassess the opinions of these physicians. In reassessing all of the medical opinion evidence, the ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of the opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's opinion over any of the others. Then, if warranted, the ALJ shall reassess plaintiff's RFC and determine at step four, with the assistance of a VE if necessary, whether plaintiff is capable of performing his past relevant work as security guard and/or an operations supervisor.[9] If plaintiff is not so capable, or if the ALJ determines to make an alternative finding at step five, then the ALJ shall proceed to step five and determine, with the assistance of a VE if

---

[9] Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to perform his past relevant work as a prisoner transporter.

necessary, whether there are jobs existing in significant numbers in the regional and national economy that plaintiff can still perform.

## VII.
## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  August 7, 2017

*Paul L. Abrams*
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE